GARCIA, J. (dissenting).
Defendant, a member of the Almighty Latin King Nation, was charged with conspiracy in the second degree in connection with an arson carried out by other gang members. His trial lasted three months. Two gang members testified pursuant to cooperation agreements. The intended victim of the arson attack-a former member of the gang-also testified. The People introduced evidence of defendant's knowledge of the conspiracy and his agreement to cause or carry out its criminal purpose. Defendant was convicted of conspiracy. I disagree with the majority's conclusion that this evidence, considered under the appropriate standard of review, was legally insufficient to support the verdict.
I.
"A verdict is legally sufficient when, viewing the facts in a light most favorable to the People, there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt" ( People v. Danielson, 9 N.Y.3d 342, 349, 849 N.Y.S.2d 480, 880 N.E.2d 1 [2007] [citations and internal quotation marks omitted] ). In a sufficiency review, a court must "marshal competent facts most favorable to the People and determine whether, as a matter of law, a jury could logically conclude that the People sustained its burden of proof" ( id. [emphasis added] ). In conspiracy cases, "deference to the jury's findings is especially important ... because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel" ( United States v. Applins, 637 F.3d 59, 76 [2d Cir2011] [citations and internal quotation marks omitted] ).
***933 In New York, "[a] person is guilty of conspiracy in the second degree when, with intent that conduct constituting a class A felony be performed, he agrees with one or more persons to engage in or cause the performance of such conduct" ( Penal Law § 105.15 ). The core of the conspiracy is the element of agreement, which will be found where there is a "concrete and unambiguous ... expression of each actor's intent to violate the law" ( People v. Caban, 5 N.Y.3d 143, 149, 800 N.Y.S.2d 70, 833 N.E.2d 213 [2005] [internal quotation marks omitted] ).
II.
On March 1, 2010, members of the Borough Park Homicide tribe (BPH) of the Latin Kings firebombed the home of Juan Kuang. Defendant did not participate in the March 1 attack but was instead charged with conspiring to commit this act of arson. It is undisputed that the defendant was a member of BPH. The only issue is whether the evidence, viewed in a light most favorable to the People, was sufficient to establish that he entered into an agreement with his fellow gang members to commit this particular crime.
To properly evaluate the proof in this case, it is crucial to understand what led to the March 1 attack. In 2009, Kuang-a member of BPH-violated gang rules by dating a Latin Queen affiliated with a rival tribe. BPH's leaders ordered him to either end the relationship or have her join BPH. Instead, Kuang quit the gang, a violation of gang rules that called for severe punishment. As a result, members of BPH began harassing Kuang and his family, leading to escalating violence.
The People put in proof of the following: (1) the BPH leadership structure and the roles and responsibilities of gang members; (2) defendant's membership in BPH; (3) defendant's participation in an earlier attack on a different residence associated with Kuang; and (4) defendant's attendance at several meetings during which the proposed arson attack was discussed and planned. Together, this proof was sufficient to support the jury's verdict.
The victim and the two cooperating gang members testified concerning the detailed leadership structure and internal security apparatus of the gang. All BPH members who are not a part of the leadership structure are considered "body members" and must attend weekly meetings, pay dues, pledge loyalty to the gang, and carry out missions on behalf of the gang. If a gang member violates a gang rule, they receive a beating. If ***934 the gang member leaves the gang, the members will either "beat you down or if they can't get you, they will get to your family." Defendant was a Latin King for at least two years prior to his arrest.
As a response to Kuang's perceived disloyalty to BPH, in February 2010, on at *565 least one occasion, gang members attacked a residence associated with Kuang and his family. At some point, a group of BPH members went to this residence where some members threw rocks and other items at the house. Defendant himself told the police in a post-arrest statement that he went to this residence with other gang members who threw "rocks, bottles[,] buckets, pretty much anything they could find to throw and create damage to the house." A group of BPH members subsequently threw Molotov cocktails at the windows, although the bottles apparently did not break through the glass. One of the cooperating witnesses at defendant's trial testified that defendant was part of that group. Though defendant was not charged with any crimes relating to that attempted arson, the jury was permitted to consider the testimony as proof of defendant's agreement in the conspiracy with which he was charged.
Later in February 2010, in response to the earlier attacks, Kuang stabbed a member of BPH-the brother of the gang's president. Following the stabbing, the leader of BPH called an emergency meeting in Prospect Park to discuss a retaliatory mission. At that meeting, gang leaders informed the members that the mission would occur that night and would involve throwing Molotov cocktails into Kuang's home. Members were selected for the mission but defendant was not chosen. Over the course of the day, two other meetings took place during which there was some discussion of the upcoming mission to firebomb Kuang's apartment. At one of these meetings, there was a discussion about the failure of the prior attempt to firebomb an apartment associated with Kuang, but a gang leader insisted that although "that wasn't done properly," he knew "what to do now to make it complete."
Defendant was arrested prior to the actual firebombing and claimed responsibility for the attack-placing himself at the scene of the crime-but also stating he "was part of something but ... didn't do it." Given the timing of his arrest, defendant's claim that he was present was not true. But it is just as clear from his post-arrest statements that he knew significant details about the planned arson prior to its execution.
***935 III.
I agree with the majority that defendant's presence at gang meetings alone is insufficient to establish agreement. I also agree with the general principle that an individual's knowledge of the goals of a conspiracy does not automatically make one a coconspirator. But the proof in this case cannot be examined in isolation: mere membership in the gang is not enough; mere knowledge of the plan is not enough; and a false confession does not establish defendant's participation. Properly marshaled as evidence, however, the proof was legally sufficient (see United States v. Sloan, 65 F.3d 149, 151 [10th Cir.1995], citing United States v. Porter, 881 F.2d 878, 887 [10th Cir.1989] ["An item of evidence, being but a single link in the chain of proof, need not prove conclusively the proposition for which it is offered. It need not even make that proposition appear more probable th(a)n not ... It is enough if the item could reasonably show that a fact is slightly more probable than it would appear without that evidence ... A brick is not a wall" (citations omitted) ] ).
In gang-related conspiracy prosecutions, evidence of the defendant's participation in a gang-while on its own is insufficient to support a conviction-is useful "to establish an agreement among the subjects, the purpose of the conspiracy and knowledge on the part of the[ ] defendant [ ]" ( *566 United States v. Sloan, 65 F.3d 149, 151 [10th Cir.1995] ; see also United States v. Alviar, 573 F.3d 526, 536-537 [7th Cir.2009] ). Indeed, "gang membership can be key to establishing criminal intent or agreement to conspire" ( United States v. Sargent, 98 F.3d 325, 328 [7th Cir.1996] ). Additionally, where "the evidence establishes that a particular gang has a specific illegal objective ... evidence of gang membership may help to link gang members to that objective" ( United States v. Garcia, 151 F.3d 1243, 1247 [9th Cir.1998] ; see United States v. Iriarte-Ortega, 113 F.3d 1022, 1024 [9th Cir.1997] ). Thus, "a jury may infer the existence of an agreement" from evidence of coordination between conspirators "for the accomplishment of a criminal purpose" ( Iriarte-Ortega, 113 F.3d at 1024 ).*
In this case, defendant, a sworn member of the Latin Kings, was charged with a conspiracy directly related to enforcing the ***936 rules and regulations governing gang membership and obligations. He admitted participating in retaliatory violence aimed at a rogue gang member, namely he stated he went with other Latin Kings to attack a residence associated with that member. When the target retaliated, defendant attended meetings-as a Latin King-during which the next, and most serious, attack on the victim was extensively planned. He demonstrated by his post-arrest claim of responsibility that he had absorbed key details of that plan at those gang meetings.
This evidence supports a "valid line of reasoning and permissible inferences from which a rational jury could have found the element of agreement proved beyond a reasonable doubt" (majority mem. at 932, 72 N.Y.S.3d at 521, 95 N.E.3d at 563). As the jury did here.
The Appellate Division, unlike this Court, may determine whether the weight of the evidence supports the verdict. Accordingly, I dissent, and would reverse the order of the Appellate Division and remit for a weight of the evidence review.
Order, insofar as appealed from, affirmed, in a memorandum.
Chief Judge DiFiore and Judges Rivera, Stein, Fahey and Wilson concur.
Judge Garcia dissents in a memorandum, in which Judge Feinman concurs.

The majority's reliance on United States v. Ceballos for the proposition that knowledge of the goals of a conspiracy is insufficient to establish agreement is misplaced (340 F.3d 115 [2d Cir.2003] ). In Ceballos, the defendant supplied narcotics to a customer who then resold the drugs to undercover agents purportedly involved in a bribery scheme. The agents, by delaying payment to the customer, pressured that customer into introducing them to the supplier-Ceballos-to explain the reason the customer had not made timely payment. Shortly before arrests were made in the case, an agent had a call with Ceballos and explained the delay in payment was tied to a bribery scheme. The government argued, based solely on the call, that Ceballos was a coconspirator in that separate bribery scheme. The Second Circuit reversed the conviction for the bribery conspiracy, noting that Ceballos's knowledge, gained from the call with the agent, did not equate to agreement to bribe public officials. There was no other evidence that Ceballos knew of, or participated in, the bribery scheme.